---

## Bear Lithia Springs Company

*v.*

## Great Bear Spring Company.

[Decided May 22d, 1906.]

1. A corporation may adopt a corporate name if not in conflict with the Corporation act, but such adoption gives it no greater right to use it to the injury of another than if an individual should so act. A corporation cannot appropriate the name or trade marks of another, and thus obtain its business by any simulation or deceit.

2. Where the complainant had first adopted as a trade mark or symbol the figure of a black bear, the defendant's subsequent use of a polar bear as a trade mark or symbol is not an infringement.

3. If the commodity which the complainant is selling under a trade name, trade mark or symbol, is offered to the public under a misrepresentation or falsehood, he has no standing in a court of equity, nor can he successfully call upon that court to aid him in preserving to him the right to deceive the public without interruption.

4. The complainant's advertisement of its water as "bottled at the spring," when in fact it was bottled at a city warehouse, and also the declaration in such advertisement that such water is a cure for certain diseases named therein contrary to the truth, are such misrepresentations as will induce the court to refuse the complainant any relief.

On final hearing on bill, answer and proofs.

*Messrs. Collins & Corbin,* for the complainant.

*Messrs. Weller & Lichtenstein,* for the defendant.

BERGEN, V. C.

The issue presented in this cause is the alleged infringement by the defendant of complainant's trade name and symbol. The complainant advertises its potable water under the name "Bear Lithia Water," and a symbol which is the representation of a black bear with the words "Bear Lithia Water" printed across its body. It appears that recently some of the advertising matter of the complainant contains figures or representations of various kinds of bears, including one of a polar bear, but such use was made for the purpose of illustrating the printed matter, and not with the intention of adopting them as a trade symbol. The symbol used by the complainant upon all of its labels, and which it relies upon as its adopted trade mark, is a black bear standing upon four feet, with the words above mentioned printed across its body. The defendant advertises its potable water and offers it to the public under the name of "Great Bear Spring Water," and is using as a trade symbol the figure of a polar bear standing on a cake of ice in some cases, and in others partly on a cake of ice and partly in the water in which the ice is floating. The complainant claims priority in the use of a bear as a symbol, and of the word "Bear" as descriptive of the origin and ownership of the articles sold, and charges that in using the polar bear as a symbol, and the words "Great Bear Spring" as descriptive, the defendant has created a confusion in the marketing of goods of the respective parties, resulting in unfair competition, besides misleading the unwary purchaser, and prays that the defendant be restrained from using the word "Bear," or the figure of a bear of any description, in connection with its business. The water sold by the complainant comes from springs at Elkton, Va., located on lands owned by a family named Bear as long ago as 1778, and which, at least since 1860, have been known in the neighborhood of Elkton as "Bear Springs," a name undoubtedly

accorded because the lands were owned by the Bear family. While the testimony shows that this water was sold prior to 1885, such sales were confined to a very limited area, and were not of sufficient moment to have any weight in settling the merits of this controversy, but in the latter year an analysis of the water was made by Professor Mallet, of the University of Virginia, which disclosed the presence in the water of twelve one thousandths of a grain of lithia per gallon, and from that time the name "Bear Lithia Water" was adopted to describe the water, and a copy of the analysis has since then been printed on the labels used by the complainant on one of its packages. The analysis of the water made by the defendant for the purposes of this suit vary so little from that made in 1885 that I am justified in assuming that the earlier analysis was substantially correct. From 1888 the complainant and its predecessors in title have extensively advertised this water as "Bear Lithia Water," in connection with the figure of the black bear above described as a symbol, until it has become well known in the market under that name. The testimony also shows that the defendant did not put its goods on the market under the name and symbol it now uses until after the complainant had, to some degree, established a name and reputation for its water under the trade name "Bear Lithia Water," in connection with its trade symbol of a black bear with the name of the water printed across its body.

The defendant's use of its name and symbol, of which complaint is made, originated as follows: Near Fulton, New York, there existed a spring known for many years in that locality as the "Great Bear Spring." It was situated in a section of country which for several miles adjacent to the spring contained numerous other springs, some of which were appreciably affected by the drawing of the water from the Great Bear Spring, for a public water-supply. In 1885 a water company was organized to furnish the city of Fulton with a public water-supply, and for that purpose the Great Bear Spring was appropriated by that company and artificially enlarged, so that its capacity was increased at the expense of other smaller springs in the immediate vicinity. In 1890 a partnership was formed by persons at Fulton under the name of the "Pure Water Supply Company,"

which at first purchased water from the Fulton Water Company, taken from the Great Bear Spring, and sold it in Syracuse, New York, as a table water. This business so increased that in 1894 the partnership established a branch in Jersey City, and began supplying potable water to purchasers in New York City, as well as in other cities adjacent. The water distributed from Jersey City does not come from the original Great Bear Spring, but from other springs located in the same district or water-shed some distance from it. The defendant undertook to show that the spring from which the water they are selling is taken was known in the neighborhood as one of the Great Bear Springs, but in my opinion the preponderance of the evidence does not favor that claim, and my conclusion is that the water which they are thus selling does not come from the Great Bear Spring, nor is it one of a group sufficiently near the Great Bear Spring to be classed as a feeder to that spring, because it has an outlet of its own and has no subterraneous connection with the Great Bear Spring, since it has not been depleted or affected by the demands made upon the greater spring.

On the 18th day of April, 1899, the defendant was incorporated under the laws of this state, assuming the name of "Great Bear Spring Company," which corporation succeeded to the property and rights of the Pure Water Supply Company, and has since conducted its business under the new name. The complainant corporation was also incorporated under the laws of this state, in August, 1899, as "Bear Lithia Springs Company," succeeding to the corporate rights of the Bear Lithia Water Company, a corporation organized under the laws of Virginia. While the water sold by the defendant was always advertised, since 1890, as "Great Bear Spring Water," the use of the polar bear as a trade emblem does not appear much earlier than 1894, at least not to an extent sufficient to indicate any intention to appropriate it for such a purpose. The complainant by its bill of complaint prays for an injunction restraining the defendant from using the word "Bear" as a part of its corporate name; from applying the word "Bear" to the water sold by it, and from using the figure of a bear of any description in advertising or selling its table water. The defendant insists that because it

was chartered by this state to use its present corporate name, this court cannot restrain such use. This proposition has not the sanction of the best authority. A corporation may adopt a corporate name if not in conflict with our Corporation act, but such adoption gives it no greater right to use it to the injury of another than if an individual should so act. A corporation cannot appropriate the name or trade marks of another, and thus obtain its business by any simulation or deceit. *C. S. Higgins Co.* v. *Higgins Soap Co., 144 N. Y. 462.*

The first question presented is, Has the defendant, by the adoption and use of a corporate name, including the word "Bear," and by advertising its goods as "Great Bear Spring Water," unlawfully infringed the rights of the complainant, resulting in unfair competition and probable confusion of business? There is no pretence that the defendant has simulated the labels or packages of the complainant, other than in the use of the figure of a polar bear. The labels otherwise are so distinct in size, shape and color as to negative any charge of attempted simulation. They are so different that no person of sufficient intelligence to warrant the court in entertaining his complaint on that score could possibly mistake the package if depending upon its appearance as an assistance to the character of his purchase. The question under this branch of the case is reduced to the charge of unfair competition in business arising from the confusion of the names of the "Great Bear Spring Water" and "Bear Lithia Water." In support of this claim the complainant has shown that it has received from its customers communications through the mails variously addressed to "Great Bear Spring Company," "Great Bear Lithia Water Company" and "Great Bear Spring Water Company," which it insists shows that the confusion among its customers is great, and that the defendant is unfairly benefited, at complainant's expense, in the competition for business between them.

The evidence in this cause leaves no doubt in my mind that, to a certain extent, the use of the word "Bear" in the two names is confusing to some of complainant's customers, and that the similarity between the names of the two corporations is so great that the ordinary purchaser may be easily confused and misled

to send his order to the defendant when it was his intention to buy from the complainant; but I am also of the opinion that the confusion shown by the testimony is not, to any appreciable extent, caused by the symbols used by these parties, but is confined entirely to the difficulty in distinguishing between the corporate names, and that the use of the word "Bear" in the two names is the principal cause of the confusion, for it is not shown that such condition existed while the defendant was marketing its water as the "Pure Water Supply Company," but only arose after the defendant had adopted its present corporate title. This title it adopted with full knowledge that the complainant was then in the market, selling its water under the title of "Bear Lithia Water Company," and it is to be charged with the knowledge that in adopting a name with the word "Bear" in it, confusion would be likely to arise, especially as the business it was engaged in was substantially the same as that then being carried on by its competitor. It might have continued to carry on its business of selling Great Bear Spring water under the name of the "Pure Water Supply Company," and have thus avoided the confusion in business proven to exist in this case. It chose to do otherwise, and the result which it should have apprehended would follow now exists, and if this question alone controlled this cause, the complainant would be entitled to the relief sought on this particular branch of the case.

The next ground of complaint is that the complainant having adopted as a trade symbol the figure of a black bear, the defendant should be enjoined from using as a trade symbol the polar bear. I am not disposed to accede to this claim. The animals represented, while of the same genus, are so dissimilar in appearance, and the labels upon which they are used so unlike in color, shape and size, that anyone relying upon the label and the symbol, as indicative of the character of the article he desired to purchase, could not be misled, nor could the goods of one of these contestants be sold as the goods of another by an unscrupulous dealer to any person of ordinary intelligence who relied upon the character of the symbol.

In *Popham* v. *Cole,* '66 *N. Y.* '69, it was held that the use of a small, lank and lean wild boar was not an infringement upon

the representation used by another of a large, fat, well-conditioned domestic animal of the same genus, the court saying that they were "so entirely dissimilar that the one can hardly be said to be an imitation of the other, and clearly not a fraudulent or deceptive imitation." In the case now under consideration the complainant's symbol is a black bear with the words "Bear Lithia Water" printed across it. The symbol used by the defendant is a large polar bear, white in color, and unless we are to hold that the use as a symbol of a black bear prevents another from using as a symbol any other of the bear genus of an entirely distinct type and color, then the complainant's contention on this point must fail, and in my judgment the use made by the complainant of the black bear with large letters across it does not give it the exclusive right to the use of every other figure of a bear.

The defendant also interposes as a reason why relief should not be afforded to the complainant that it does not come into court with clean hands. It was shown that on all of the labels used on carbonated water by the complainant is the statement that the water is "bottled at the springs." This statement was proven to be untrue. The water is not bottled at the springs, but is brought from the springs in large glass-lined tank cars to New York City, where it is siphoned by a pipe or hose into a tank in the warehouse, and from thence bottled. The complainant seeks to meet this charge by the argument that, as they bring the water from the springs in glass-lined tanks, for all essential purposes it is bottled at the springs. This argument does not appeal to me, if there is any merit in having the water put in the bottles at the springs, and that there is merit is to be inferred from the fact that the complainant keeps that statement constantly before the eyes of its purchasers. In my judgment this statement is material in inducing the public to purchase what the complainant offers for sale. It may be fanciful, it may be that just as good results are reached by bringing the water in glass-lined car tanks and bottling it in New York City as if it was bottled at the springs, but the purpose of the advertisement is to induce the sale of the water, and when the public are buying potable water because they supposed it to be bottled

at the source or spring, and thus kept pure and less subject to contamination, and therefore more healthful than that furnished through the ordinary public water-supply or other local sources, they have a right to be furnished with what it is represented to them they are buying, and it does not answer the purpose to be told that some other method of bottling is just as good. The complainant, during the progress of the trial, when this point was made by the defendant, gave orders to discontinue the use of the labels containing the false statement, but in my judgment repentance came too late to be entitled to any consideration in the determination of this cause. The condition existed when the bill of complaint was filed, and the discontinuance of the misrepresentation when discovered and exposed is entitled to but little consideration in determining the *bona fides* of the complainant's position when it applied for equitable assistance.

The second objection urged by the defendant in this point is that the complainant has falsely represented to the public the curative property of Bear Lithia Water, and that such representation was known to the complainant to be untrue. The evidence shows, beyond doubt, that as long ago as 1893 the complainant's circular advertisements and all letterheads used by it contained the following representations referring to Bear Lithia Water:

"Nature's own remedy. Cures kidney and bladder troubles, uric acid, gout and rheumatism, phosphoric deposits, inflammation of the bladder, dropsical affections, brick dust deposits, gravel, and all forms of dyspepsia."

The advertisement on the letterheads included malaria as one of the ills curable by the use of this water, but this statement was not embraced in the circular. The letterheads of the complainant now in use still advertise that the water *cures* not only the foregoing list of ailments, but, in addition thereto, "Albuminuria, cholera infantum, malaria, and all forms of dyspepsia." It is proper to say that all of complainant's advertisements do not make the broad claim above set out, but the general trend of them all is an appeal to those suffering from the enumerated troubles to use the water with a confident expectation of cure in all cases which are supposed to be derangements likely to yield

to lithia when prescribed as a medicine, and the information sought to be conveyed by these advertisements is that the presence of lithia in the Bear Lithia Water makes it an antidote in cases of that class.

The testimony shows that the minimum dose of lithia usually prescribed by a reputable physician for the relief of a disease for which that medicine in its commercial form is usually given is three grains each, three times a day, and in order to administer a like quantity by using Bear Lithia Water, the patient would have to drink at least one thousand gallons of water in twenty-four hours. The testimony of three most reputable physicians called by the defence shows very clearly that the water, used as freely as human capacity will permit, not only will not cure, but will not afford any benefit beyond such as would come from the use of any ordinarily pure drinking water. The complainant produced some witnesses as experts who had no experience in the use of the water, but their testimony proves nothing beyond the claim that from a chemical standpoint the analysis was not inconsistent with the possibility that the water might have a beneficial effect upon the diseases it was claimed it would cure. One of the witnesses gave it as his opinion that "its mineralization does not preclude its being of medicinal value," and that the possibility would be enhanced if there was present a recently-discovered agent, which he described as "radio activity," but there was no evidence that "radio activity" was present in the water. The testimony of these experts as a display of learning is very interesting, but does not meet the question at issue, for none of the experts or physicians called by either side pretend that this water would cure any of the diseases named, except Dr. Smith, who did say that acute rheumatism, resulting from a gouty affection, might be cured by the use of a proper remedy, and that such a result might be reasonably expected from the use of this water, but that it would cure rheumatism generally he did not assert.

The credulity of a court cannot be expected to extend beyond a reasonable limit, and when testimony is given which is opposed to common knowledge and the experience of mankind, as well as reliable medical evidence, hypothetical testimony which

seeks to lead to a contrary result must be rejected as of no value. It is testimony, but not evidence. That this water will not cure the ills it is promised by the complainant that it will is in accord with the evidence in this cause and with common sense. There may have been isolated cases where the user supposed his recovery was aided, or perhaps produced, by the use of this water, for conditions may have existed in some cases which made it appear to the person benefited that it was the result of the use of this water, but that is the case with every quack medicine, as the numerous testimonials obtainable and published in such cases testify, but that this water will cure all the human ills it is advertised to do no sane person can for a moment believe, and assuming, as we must in the absence of contrary evidence, that the managers of the complainant corporation were and are in that class, they were, in advertising for sale their commodity, making a statement which they know to be false. The question is thus presented, Do such representations justify this court in refusing the relief asked for? In considering this question I disregard all claims of the complainant to the effect that the defendant has been guilty of like conduct, without passing upon the question whether such conduct has been proven, for the complainant is the supplicant for aid, and it is its position, and not that of the defendant, which must be established to be such as to appeal to a court of conscience. In cases of this class the complainant, to be entitled to equitable relief, must show an honest property right in the trade mark or label for which he is seeking protection, and the rule is well settled that if the commodity which the complainant is selling under a trade name, trade mark or symbol is offered to the public under a misrepresentation or falsehood, he has no standing in a court of equity, nor can he successfully call upon that court to aid him in preserving to him the right to deceive the public without interruption. *Manhattan Company* v. *Wood, 108 U. S. 218; Worden* v. *California Fig Co., 102 Fed. R. 334,* and cases there cited and discussed.

An advertisement, "The great smallpox and diphtheria cure and preventive, cures the worst cases without marking," &c., was held to be such a misrepresentation as to require the court

to withhold its aid from the party using it. *Houchens* v. *Houchens, 95 Md. 37; 51 Atl. Rep. 822.* The doctrine that the complainant must come into court for relief, in causes of this class, with clean hands, and that if any misrepresentation is used by the complainant to enhance the sale of his product it will induce the court to withhold its decree, is so well supported by authority that a citation of them is unnecessary.

This complainant has advertised its water as bottled at the spring. The ordinary and proper interpretation of this language, and the one intended to be conveyed by the complainant, is that the water in the bottle upon which the label is pasted was put in that bottle at the spring, and thus kept free from any possible contamination that might affect it during transportation to the buyer, and he is justified in relying upon that statement, a statement not true, and known to the complainant to be false.

In *Krause* v. *Peebles & Son, 58 Fed. Rep. 585, 594,* Judge Taft said: "The manifest advantage which 'distillery' bottling has in the bottled whiskey trade arises from the improbability that a distiller, bottling whiskey at his own distillery warehouse, would bottle any whiskey but that which he has distilled," and he refused the injunction upon the ground that this advertisement was a misrepresentation. The argument used by Judge Taft applies with equal force to water, and bottling it in a warehouse in New York City is not bottling it at a spring.

The declaration that the Bear Lithia Water is a cure for the diseases named is not an expression of opinion as to the possible or hoped-for effect, but a positive statement of a fact which is not and cannot be true. The care with which all courts have protected the public against imposition, so far as they have had the power, should be rigorously exercised when the misrepresentation is calculated to mislead those seeking a restoration to health, and any conduct which leads people to believe that a remedy will effect a cure, when it is known that it will not, is a menace to the community that cannot be too severely condemned, and the court should hasten to declare its determination not to aid in its perpetuation.

There will be a decree dismissing the bill of complaint.